1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NAJIB ALI ADEN,

                Petitioner,

    v.

KIRSTJEN M NIELSEN, et al.,

                Respondents.

Case No. C18-1441-RSL-MAT

REPORT AND RECOMMENDATION

## I.     INTRODUCTION

Petitioner, who was born in Kenya and has been ordered removed to that country, brings this action under 28 U.S.C. § 2241 and the Administrative Procedures Act to enjoin the Government from removing him to Somalia without an immigration judge ("IJ") designating Somalia and giving him an opportunity to apply for withholding and relief under the Convention Against Torture ("CAT"). Dkt. 1. He also seeks immediate release from immigration detention. *See id.* The Court temporarily stayed his removal pending resolution of his claims. *See* Dkts. 2, 3. Currently before the Court is the Government's motion to dismiss, which petitioner opposes. *See* Dkts. 5, 8, 9. Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends that both petitioner's habeas petition and the Government's

REPORT AND RECOMMENDATION - 1

1  motion to dismiss be GRANTED in part and DENIED in part, as discussed below.  The Court also

2  recommends that the temporary stay of removal be VACATED.

3  II.    BACKGROUND

4  Petitioner was born in a refugee camp in Kenya to Somali parents and was orphaned as an

5  infant.  Dkt. 2-1 at 1-2; Dkt. 8-1 at 1; Dkt. 8-2 at 1.  He was raised by an aunt in the Kenyan camp

6  and came to the United States as a refugee in 2007 when he was 15 years old.  Dkt. 2-1 at 1; Dkt.

7  2-2 at 12-13; Dkt. 6-1 at 2-3; Dkt. 8-2 at 1.  Petitioner applied for lawful permanent residence in

8  December 2011 and his application was approved in May 2012.  Dkt. 6-1 at 5-10.

9  A.    Petitioner's removal proceedings

10  In 2014, petitioner was convicted of robbery offenses in King County, Washington.  Dkt.

11  2-2 at 11.  After he served his sentence, the Department of Homeland Security ("DHS") took him

12  into custody and detained him at the Northwest Detention Center.  *Id.* at 1-3, 10-12; *see also* Dkt.

13  6-1 at 17, 19.  During an initial interview with an immigration officer on October 4, 2017,

14  petitioner indicated that he is a native and citizen of Kenya and that his deceased parents were

15  natives and citizens of Somalia.  Dkt. 6-1 at 14.  The same day, DHS initiated removal proceedings

16  against him by filing a Notice to Appear ("NTA"), which alleged that he is removable based on

17  his robbery convictions.  Dkt. 2-2 at 1-3.  The NTA also alleged that he is a native and citizen of

18  Kenya.  *Id.*  DHS determined that petitioner should be detained pending his removal proceedings.

19  Dkt. 6-1 at 17; *see also id.* at 19.

20  During removal proceedings, petitioner admitted the allegations in the NTA, including that

21  he is a native and citizen of Kenya.  Dkt. 7 at ¶ 9.  Petitioner designated Kenya as the country of

22  removal.  Dkt. 2-1 at ¶ 4; Dkt. 7 at ¶ 9.  Somalia was not discussed during the removal proceedings

23  as an alternative country of removal.  Dkt. 2-1 at ¶ 4.  On December 20, 2017, the IJ ordered him

removed to Kenya.  Dkt. 2-1 at ¶ 4; Dkt. 7 at ¶ 9; Dkt. 7-1 at 18.  Both parties waived the right to appeal the IJ's order.  Dkt. 7-1 at 18.

B.     ICE's efforts to remove petitioner

On January 9, 2018, U.S. Immigration and Customs Enforcement ("ICE") Deportation Officer Jose Alvarez submitted a travel document request to the Kenyan government on petitioner's behalf, which asserted that petitioner was a native and citizen of Kenya.[1]  Dkt. 7 at ¶ 11; Dkt. 7-2 at 2-3.  On February 26, 2018, the Consulate General of the Republic of Kenya issued a determination finding that petitioner is not a citizen of Kenya and denying ICE's request for a travel document.  Dkt. 7 at ¶ 14; Dkt. 7-2 at 8; Dkt. 10 at ¶ 6.

Subsequently, Officer Alvarez began to inquire about the possibility of removing petitioner to Somalia, where his parents were born.  Dkt. 10 at ¶ 7.  In March 2018, Officer Alvarez informed petitioner that Kenya had denied his request for a travel document and that ICE would be seeking a travel document from Somalia.  Id. at ¶ 8; Dkt. 2-1 at ¶ 5.  The parties dispute what occurred during this conversation.  Petitioner avers that he told Officer Alvarez that he was afraid to go to Somalia and would want to reopen his case to fight any efforts to send him there.  Dkt. 2-1 at ¶¶ 4-5; Dkt. 8-2 at ¶ 2.  According to petitioner, Officer Alvarez told him that he could reopen his case but they should get a travel document first.  Dkt. 8-2 at ¶ 3.  Officer Alvarez, on the other hand, declares that petitioner stated he did not want to go to Somalia, but he never stated he was afraid he would be harmed there.  Dkt. 10 at ¶ 9.  Officer Alvarez left petitioner with paperwork to fill out that would assist in obtaining a travel document from Somalia.  Dkt. 8-2 at 4.

When petitioner and Officer Alvarez next met to discuss obtaining a travel document to Somalia, petitioner refused to cooperate.  Dkt. 8-2 at ¶ 5; Dkt. 10 at ¶¶ 10-11.  Petitioner stated

[1] The travel document request incorrectly stated that petitioner's parents were born in Kenya, Dkt. 7-2 at 4, but this oversight was corrected during petitioner's interview with Kenyan consular officials, Dkt. 10 at ¶ 6.

REPORT AND RECOMMENDATION - 3

that he wanted to reopen his case and was consulting with an attorney.  Dkt. 8-2 at ¶ 5; Dkt. 10 at ¶¶ 10-11.

On March 21, 2018, Officer Alvarez submitted a Somali travel document application on petitioner's behalf, claiming that petitioner was a native of Kenya and a citizen of Somalia.  Dkt. 7-2 at 10-11.  Officer Alvarez completed the application based on information provided by petitioner but without petitioner's assistance or review.  *See* Dkt. 10 at ¶ 10.  As petitioner points out, there appear to be several errors in the application, including that petitioner was born in Somalia, not Kenya, and that he had previously lived in Somalia, when in fact he has never been there.  *See* Dkt. 8-1; Dkt. 8-2 at ¶¶ 6-7; Dkt. 2-1 at ¶ 4.

On March 30, 2018, ICE released petitioner from immigration custody on an order of supervision because it had determined that removal was not significantly likely in the reasonably foreseeable future.  Dkt. 7 at ¶¶ 18-19; Dkt. 7-2 at 13, 15-17.  The release notification letter informed petitioner that ICE would continue to make efforts to obtain a travel document and, "Once a travel document is obtained, you will be required to surrender to ICE for removal.  You will, at that time, be given an opportunity to prepare for an orderly departure." Dkt. 7-2 at 13.

On May 17, 2018, the Embassy of the Federal Republic of Somalia determined that petitioner is a national and issued a travel document that was valid until November 18, 2018.  Dkt. 7 at ¶ 20; Dkt. 7-2 at 19.  ICE did not inform petitioner that it had obtained the travel document.  Dkt. 2-1 at ¶¶ 8-9.

On June 15, 2018, an ICE officer called petitioner and informed him that he had been approved to do check-ins with ICE by phone but would need to come into the office to sign paperwork.  *Id.* at ¶ 8.  When petitioner reported to the ICE office on June 18, 2018, an officer served him with a Notice of Revocation of Release and detained him.  Dkt. 7 at ¶ 23; Dkt. 7-2 at

21-22; Dkt. 2-1 at ¶ 8.  The Notice informed petitioner that ICE had determined that there was a significant likelihood of removal in the reasonably foreseeable future, but otherwise ICE officers refused to tell petitioner what was going on.  Dkt. 7-2 at 21; Dkt. 2-1 at ¶ 8.  On June 21, 2018, ICE transferred petitioner to a facility in Louisiana as a part of the staging process for a chartered flight to Somalia.  Dkt. 7 at ¶ 24; Dkt. 2-1 at ¶ 8.  ICE officers continued to refuse to tell petitioner what they were planning to do with him.  Dkt. 2-1 at ¶ 9.  After speaking with other detainees, petitioner determined that a group was going to be flown to Somalia on June 28, 2018.  *Id.*  Petitioner's family contacted the Somali consulate, which confirmed that he was going to be on that flight.  *Id.*  No one from ICE ever informed petitioner that he was going to be sent to Somalia.  *Id.*

Petitioner was able to contact an attorney at the Northwest Immigrant Rights Project, Chris Stanislowski, regarding his situation.  *Id.*  On June 22, 2018, Attorney Stanislowski contacted ICE on petitioner's behalf, raising the fact that Somalia had never been designated by an IJ and that petitioner feared being sent to that country.  *Id.*; Dkt. 7 at ¶ 25.  The same day, ICE responded that it did not oppose petitioner filing a motion to reopen in order to seek asylum and related relief to Somalia and that it would stay his removal to Somalia in anticipation of such a motion being filed. Dkt. 7 at ¶ 25.  ICE then cancelled petitioner's scheduled removal to Somalia and transferred him back to the Northwest Detention Center on July 10, 2018.  *Id.*

On August 20, 2018, ICE contacted Attorney Stanislowski via email, stating that petitioner's removal had been cancelled based on the understanding that petitioner intended to seek asylum and inquiring if petitioner intended to file a motion to reopen, as one had not yet been filed. *Id.* at ¶ 27.  Attorney Stanislowski informed ICE that petitioner did not intend to file a motion to reopen.  *Id.*  Petitioner's position is that ICE must file a motion to reopen if it seeks to designate

1    Somalia as the removal country.  *See* Dkt. 8 at 8-9.  On September 19, 2018, ICE informed

2    petitioner, through Attorney Stanislowski, that if he did not file a motion to reopen by October 3,

3    2018, ICE would proceed with coordinating petitioner's removal to Somalia.  Dkt. 7 at ¶ 28.  ICE

4    reiterated that it would not oppose a motion to reopen.  *Id.*

5    C.    <u>The instant habeas action</u>

6           On October 1, 2018, petitioner filed the instant action and a motion for stay of removal.

7    Dkt. 1.  On October 2, 2018, the Court temporarily stayed petitioner's removal pending resolution

8    of his motion to stay.  Dkt. 3.  The Government timely filed a motion to dismiss, which is now ripe

9    for review.  *See* Dkts. 5, 8, 9.

10          The Government argues that dismissal is appropriate because DHS properly designated

11   Somalia for removal and petitioner has been provided the opportunity to seek meaningful review

12   of that designation but has chosen not to do so.  *See id.*  The Government also contends that

13   petitioner should be required challenge DHS's designation of Somalia in the immigration courts

14   before seeking habeas relief, and suggests that the Court may lack jurisdiction over the action.  *See*

15   *id.*  Finally, the Government argues that petitioner is not entitled to release because his removal to

16   Somalia is likely to occur in the reasonably foreseeable future.  *See id.*

17          In opposing dismissal, petitioner argues that DHS is not permitted to lawfully designate

18   Somalia outside of removal proceedings and without a hearing on his fear of persecution and

19   torture.  *See* Dkt. 8.  Petitioner also asserts that DHS is barred from designating Somalia as his

20   country of citizenship or nationality because it is bound by the judicial admissions in the NTA that

21   he is a native and citizen of Kenya.  *See id.*  He argues further that DHS bears the burden of moving

22   to reopen, that there are no exhaustion or jurisdiction issues prohibiting this Court's review, and

23   that he is entitled to immediate release.  *See id.*

1

III.    <u>DISCUSSION</u>

2      The issues before the Court are (1) whether the Court has jurisdiction, (2) whether DHS

3 may designate a removal country outside of removal proceedings, (3) the proper procedures for

4 designating a removal country outside of removal proceedings, (4) whether DHS violated

5 petitioner's rights in this case, and (5) whether petitioner is entitled to immediate release.  As

6 detailed below, the Court concludes that it has jurisdiction over the action, that DHS may designate

7 a removal country outside of removal proceedings but that it must comply with several procedural

8 requirements in order to do so, that DHS failed to comply with all of these requirements in

9 petitioner's case, and that petitioner is not entitled to immediate release but is entitled to a bond

10 hearing.  In addition, although neither party addressed the temporary stay of removal entered in

11 this case, it appears that such an order is no longer necessary and can be vacated.

12 A.    <u>Jurisdiction</u>

13      In a footnote, the Government argues that the Court lacks jurisdiction over this action to

14 the extent it is interpreted as a challenge to the IJ's removal order, pointing to 8 U.S.C. §

15 1252(a)(5).  Dkt. 5 at 9 n.2.  In the REAL ID Act of 2005, Congress amended the Immigration and

16 Nationality Act to "expressly eliminate[] habeas review over all final orders of removal . . . ."  *A.*

17 *Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007).  It provided that "a petition for review filed

18 with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review

19 of an order of removal."  8 U.S.C. § 1252(a)(5); *see Martinez-Rosas v. Gonzales*, 424 F.3d 926,

20 928-29 (9th Cir. 2005) (under REAL ID Act, a petition for review in the court of appeals "is now

21 the exclusive means for challenging final removal orders by the [Board of Immigration Appeals

22 ("BIA")], except those issued pursuant to 8 U.S.C. § 1225(b)(1)").

23      The REAL ID Act effectively limits a noncitizen "to one bite of the apple with regard to

REPORT AND RECOMMENDATION - 7

challenging an order of removal." *A. Singh*, 499 F.3d at 977 (internal quotation marks and citation omitted). Thus, even habeas "claims that indirectly challenge a removal order" are prohibited. *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012). "When a claim by [a noncitizen], however it is framed, challenges the procedure and substance of an agency determination that is *inextricably linked* to the order of removal, [a district court's review of the claim] is prohibited by section 1252(a)(5)." *Id.* at 623 (internal citation and quotation marks omitted, emphasis added).

The REAL ID Act, however, was "not intended to 'preclude habeas review over challenges to detention that are independent of challenges to removal orders.'" *V. Singh v. Holder*, 638 F.3d 1196, 1211 (9th Cir. 2011) (quoting H.R. Rep. No. 109-72 at 175). Accordingly, as a general rule, noncitizens "may continue to bring collateral legal challenges to the Attorney General's detention authority . . . through a petition for habeas corpus." *Id.* (quoting *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 946 (9th Cir. 2008)). The determination of whether a case raises independent claims or indirectly challenges a final removal order requires "a case-by-case inquiry turning on a practical analysis." *Id.* The "distinction between an independent claim and indirect challenge will turn on the substance of the relief that a plaintiff is seeking." *Martinez*, 704 F.3d at 622 (internal quotation marks and citation omitted).

The Government cites *Tonfack v. Holder*, No. 13-1886, 2013 WL 5570232 (M.D. Pen. Oct. 9, 2013), *aff'd Tonfack v. Attorney General*, 580 Fed. Appx. 79 (3d Cir. 2014) (unpublished). In *Tonfack*, the habeas petitioner was a national of Cameroon and a citizen of the Ivory Coast. *Tonfack*, 2013 WL 5570232, at *1. The IJ ordered him removed but failed to designate a removal country, as required by BIA precedent; the IJ also granted withholding of removal to the Ivory Coast. *Tonfack*, 580 Fed. Appx. at 80-81. ICE then obtained a travel document from Cameroon and sought to remove him. *Tonfack*, 2013 WL 5570232, at *2. Through the habeas action, the

1    petitioner challenged the validity of the travel document to Cameroon, ICE's decision to remove

2    him to a country other than the Ivory Coast, and ICE's alleged failure to consider his CAT claims

3    as they pertained to Cameroon.  *Id.*  The district court found that each of the petitioner's arguments

4    directly challenged his final order of removal and dismissed for lack of jurisdiction.  *Id.*

5         The Third Circuit affirmed in an unpublished opinion.  *Tonfack*, 580 Fed. Appx. at 81.  The

6    Court of Appeals found that petitioner's claim that Cameroon was not a proper country of removal

7    was encompassed in the removal order because the IJ was required to designate a country of

8    removal during the removal proceedings.  *Id.*  According to the Third Circuit, the fact that the IJ

9    did not select a country for removal was relevant to the validity of the final order.  *Id.*  The court

10   also noted that the courts of appeals regularly consider petitions for review that challenge whether

11   the immigration courts selected a proper country for removal or whether the IJ neglected to

12   designate a country for removal.  *Id.*  The court declined to consider any due process argument

13   because the IJ had reopened the petitioner's removal proceedings to allow him to challenge the

14   proposed removal to Cameroon.  *Id.* at 81 n.2.  The court ultimately concluded that the petitioner

15   could have raised his issues in a petition for review, and therefore habeas review would violate §

16   1252(a)(5).

17        In this case, the Court concludes that petitioner's claims are independent of his removal

18   order.  Petitioner does not challenge the IJ's determination that he is removable or claim any

19   deficiency in the removal order itself.  Rather, he challenges DHS's attempts, *outside* of removal

20   proceedings, to designate Somalia without first reopening his proceedings so that an IJ could make

21   this determination.   To resolve petitioner's arguments, the Court does not need to review the

22   removal order.  *See A. Singh*, 499 F.3d at 972 (habeas claim that does not require review of a

23   removal order is not barred by § 1252(a)(5)).  Furthermore, petitioner could not have brought these

1  claims during his immigration proceedings. *Tonfack*, which is non-precedential, is distinguishable

2  because the petitioner in that case alleged a flaw in his removal order—the IJ's failure to designate

3  a removal country—that he could have challenged through a petition for review. For these reasons,

4  the Court has jurisdiction over this action.

5  B.    Legal framework for designating country of removal

6          "After determining that a noncitizen is removable, an IJ must assign a country of removal."

7  *Hadera v. Gonzales*, 494 F.3d 1154, 1156 (9th Cir. 2007). The IJ may also identify alternative

8  countries. 8 C.F.R. § 1240.12(d) ("When a respondent is ordered removed from the United States,

9  the immigration judge shall identify a country, or countries in the alternative, to which the

10  [noncitizen's] removal may in the first instance be made, pursuant to [8 U.S.C. § 1231(b)(2)].").

11  The IJ's country designation must comply with the four-stage inquiry set forth in § 1231(b)(2).

12  *Jama v. ICE*, 543 U.S. 335, 338 (2005); *Dzyuba v. Mukasey*, 540 F.3d 955, 956 (9th Cir. 2008)

13  (per curiam); *Hadera*, 494 F.3d at 1156-57; *Himri v. Ashcroft*, 378 F.3d 932, 938 (9th Cir. 2004).

14          In the first instance, the IJ must give the noncitizen an opportunity to designate one country

15  to which the noncitizen wants to be removed. *See* 8 U.S.C. § 1231(b)(2)(A) (a noncitizen "who

16  has been ordered removed may designate one country to which the [noncitizen] wants to be

17  removed . . ."); 8 C.F.R. § 1240.10(f) ("The immigration judge shall notify the respondent that if

18  he or she is finally ordered removed, the country of removal will in the first instance be the country

19  designated by the respondent, except as otherwise provided under [§ 1231(b)(2)], and shall afford

20  him or her an opportunity then and there to make such a designation."). Second, if the noncitizen

21  fails to designate a country or as an alternative in the event the noncitizen's designated country

22  does not accept the individual, the IJ may designate a country of which the noncitizen is a subject,

23  national, or citizen. 8 U.S.C. § 1231(b)(2)(D); *Hadera*, 494 F.3d at 1156-57. Third, if no country

1    satisfies the requirements of § 1231(b)(2)(D), the IJ must designate a country with which the

2    noncitizen has a lesser connection, as specified in the statute.  *See* 8 U.S.C. §§ 1231(b)(2)(E)(i)-

3    (vi); *Jama*, 543 U.S. at 341; *Hadera*, 494 F.3d at 1157 (because there was no basis to designate a

4    country under § 1231(b)(2)(D), IJ should have continued to the third step).  Finally, if removal

5    under the third step is "impracticable, inadvisable, or impossible," the IJ must designate "another

6    country whose government will accept the [noncitizen] into that country."   8 U.S.C. §

7    1231(b)(2)(E)(vii); *Jama*, 543 U.S. at 341; *Himri*, 378 F.3d at 939 (holding that "at the time the

8    government proposes a country of removal pursuant to § 1231(b)(2)(E)(vii), the government must

9    be able to show that the proposed country *will* accept the [noncitizen]") (emphasis in original).

10    Importantly, ICE may not remove a noncitizen to a country if the noncitizen's life or

11    freedom would be threatened in that country because of the noncitizen's race, religion, nationality,

12    membership in a particular social group, or political opinion.  8 U.S.C. § 1231(b)(3).   If the

13    noncitizen expresses fear of persecution or harm upon return to any of the countries designated by

14    the IJ, the IJ must inform the noncitizen that he or she may apply for asylum, withholding of

15    removal, or relief under the CAT.  8 C.F.R. § 1240.11(c)(1); *see also Jama*, 543 U.S. at 348 ("If

16    [noncitizens] would face persecution or other mistreatment in the country designated under §

17    1231(b)(2), they have a number of available remedies: asylum, § 1158(b)(1); withholding of

18    removal, § 1231(b)(3)(A); relief under an international agreement prohibiting torture, *see* 8 CFR

19    §§ 208.16(c)(4), 208.17(a) (2004) . . . .").   "Failing to notify individuals who are subject to

20    deportation that they have a right to apply for asylum in the United States and for withholding of

21    deportation to the country to which they will be deported violates both INS regulations and the

22    constitutional right to due process." *Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999); *see*

23    *also Kossov v. INS*, 132 F.3d 405, 408 (7th Cir. 1998) (IJ's failure to inform noncitizens, who were

*pro se*, that they had the right to seek asylum to country that was a possible deportation site was a "fundamental failure of due process").

The IJ's country designation is subject to judicial review in the courts of appeals. *E.g.*, *Dzyuba*, 540 F.3d at 956-57 (holding that substantial evidence did not support BIA's designation of Ukraine under § 1231(b)(2)(E)(i) and remanding for determination of whether Ukraine was a "country" within the meaning of § 1231(b)(2)(E)(i) at the time the petitioner entered the United States); *Hadera*, 494 F.3d at 1157-58 (holding that IJ had no basis for designating Ethiopia under § 1231(b)(2)(D) and remanding to IJ for redetermination of the country of removal); *Himri*, 378 F.3d at 934 (holding that Jordan could not be designated as a removal country under any provision of § 1231(b)(2)).

After the IJ's removal order is final, DHS is tasked with removing the noncitizen.[2]  *See* 8 U.S.C. § 1231(b)(2).  The regulations provide that if DHS "is unable to remove the [noncitizen] to the specified or alternative country or countries, the order of the immigration judge does not limit the authority of [DHS] to remove the [noncitizen] to any other country as permitted by    [§ 1231(b)]."  8 C.F.R. § 1240.12(d).  Subject to the prohibition on removal to a country where the noncitizen's life or freedom would be threatened, *see* 8 U.S.C. § 1231(b)(3), § 1231(b)(2) requires DHS to remove the noncitizen to his or her country of choice unless certain exceptions apply, in which case it shall remove the noncitizen to a country of which he or she is a "subject, national, or citizen." 8 U.S.C. §§ 1231(b)(2)(A), (C).  If the government of that country is not willing to accept the noncitizen into the country or fails to respond to DHS's inquiries within a reasonable time, DHS shall remove the noncitizen to any other country as provided in § 1231(b)(2)(E).

---

[2] The statute refers to the Attorney General; however, DHS "assumed responsibility for the removal program" in 2003.  *Jama*, 543 U.S. at 338 n.1.  As a result, the discretion formerly vested in the Attorney General under § 1231 is now vested in the Secretary of Homeland Security.  *Id.*

C.    Whether DHS may designate a removal country outside of removal proceedings

The Government argues that it has the authority to designate a removal country outside of removal proceedings under § 1240.12(d), which provides that if DHS "is unable to remove the [noncitizen] to the specified or alternative country or countries, the order of the immigration judge does not limit the authority of [DHS] to remove the [noncitizen] to any other country as permitted by [§ 1231(b)]."  Petitioner responds that the Government reads § 1240.12(d) too broadly and that the Ninth Circuit has repeatedly held that a person may not be removed to a country that was not properly designated by an IJ under § 1231(b)(2), citing to cases involving designation during removal proceedings.  *See Hadera*, 494 F.3d at 1159; *Himri*, 378 F.3d at 938; *Dzyuba*, 540 F.3d at 957.  Petitioner thus contends that the procedures that apply *during* removal proceedings also apply *after* removal proceedings.

As explained above, the regulations specifically require the IJ to designate a removal country during removal proceedings, and courts have instructed IJs to do so in accordance with § 1231(b)(2).  The regulations do not, however, require an IJ to designate a removal country after removal proceedings have concluded if DHS is unable to remove the noncitizen to the country originally designated.  Instead, § 1240.12(d) permits *DHS* to remove the noncitizen to another country authorized by § 1231(b).  The statutory language of § 1231(b) also grants authority to DHS, not the immigration courts: § 1231(b)(2)(A) orders DHS to remove the noncitizen to the country he or she designated; § 1231(b)(2)(C) authorizes DHS to disregard the designation under subsection (A) in certain circumstances, including when the designated country is not willing to accept the noncitizen; and §§ 1231(b)(2)(D) and (E) require DHS to remove the noncitizen to an appropriate alternative country.  Given express grant of authority to DHS under § 1231(b)(2) and § 1240.12(d), the Court concludes that DHS may designate a removal country outside of removal

proceedings.[3]

The Court is not persuaded by petitioner's argument that if § 1240.12(d) allows DHS to designate outside of removal proceedings, there would have been no reason for the courts in *Dzyuba* or *Hadera* to remand to the immigration courts to determine whether the designation was appropriate.  Dkt. 8 at 15.  Both *Dzyuba* and *Hadera* involved designation *during* removal proceedings, and therefore the procedural posture of those cases was materially different than the situation here.  *See Dzyuba*, 540 F.3d at 955; *Hadera*, 494 F.3d at 1155.  In addition, as discussed below, due process requires DHS to afford noncitizens a meaningful opportunity to challenge DHS's designation in the immigration courts.

D.    Proper procedures for designating removal country outside of removal proceedings

Based on the record in this case, it is apparent that DHS does not have procedures in place to ensure compliance with § 1231(b)(3) and due process.  Indeed, ICE was prepared to remove petitioner to Somalia without notice, much less an opportunity to be heard, and likely would have done so if petitioner had not obtained counsel.  Petitioner has presented evidence that this was not an isolated incident and that DHS has failed to notify other noncitizens before removing them to countries not designated in their removal orders. Dkt. 8-4; *see also Gebrekidan v. Clark*, No. C06-1657-RSL-JPD, 2006 WL 3337369 (W.D. Wash. Nov. 16, 2006) (granting temporary stay of removal where petitioner was ordered removed to Eritrea and ICE was attempting to remove him to Ethiopia where he feared persecution and torture).  These facts are alarming to say the least.

It is unlawful for DHS to remove a noncitizen to a country where the noncitizen's life or freedom would be threatened.  8 U.S.C. § 1231(b)(3).  Noncitizens in the United States are

---

[3] The Court's decision is in accord with *Kifle v. Holder*, 507 Fed. Appx. 703, 703 (9th Cir. 2013) (unpublished) ("Even though the IJ did not make a finding on the record that Ethiopia was an appropriate country for removal under 8 U.S.C. § 1231(b)(2), DHS had authority to designate it as such once it found that Sudan, the country designated in the IJ's order of removal, was unwilling to accept Petitioner.  *See* 8 C.F.R. § 1240.12(d) . . . .").

1  protected by the Fifth Amendment's due process clause, *Mathews v. Diaz*, 426 U.S. 67, 77 (1976),

2  which requires notice of the designated removal country and an opportunity to apply for asylum

3  and related relief, *Andriasian*, 180 F.3d at 1041 ("Failing to notify individuals who are subject to

4  deportation that they have a right to apply for asylum in the United States and for withholding of

5  deportation to the country to which they will be deported violates both INS regulations and the

6  constitutional right to due process."); *Kossov*, 132 F.3d at 408 (IJ's failure to inform noncitizens,

7  who were *pro se*, that they had the right to seek asylum to country that was a possible deportation

8  site was a "fundamental failure of due process"); *see also Mathews v. Eldridge*, 424 U.S. 319, 333

9  (1976) ("The fundamental requirement of due process is the opportunity to be heard at a

10  meaningful time and in a meaningful manner.") (internal quotation omitted).

11      To ensure compliance with § 1231(b)(3) and due process, the Court finds that DHS must

12  do the following prior to removing a noncitizen to a country not designated by the IJ.  First, DHS

13  must provide the noncitizen with written notice of the country being designated outside of removal

14  proceedings and the statutory basis for the designation, i.e., the applicable subsection of §

15  1231(b)(2).  This requirement is similar to the regulations governing reinstatement of a removal

16  order, which require that an immigration officer give the noncitizen written notice of the

17  determination that the noncitizen is subject to removal.  *See* 8 C.F.R. § 241.8(b).

18      Second, DHS must ask the noncitizen whether he or she fears persecution or harm upon

19  removal to the designated country and memorialize in writing the noncitizen's response.  This

20  requirement ensures DHS will obtain the necessary information from the noncitizen to comply

21  with § 1231(b)(3) and avoids the situation presented in this case where the parties dispute whether

22  petitioner told Officer Alvarez that he feared persecution in Somalia.

23      Third, if the noncitizen expresses a fear of persecution or harm, DHS must inform the

1   noncitizen that he or she may seek asylum, withholding, and relief under the CAT by filing a

2   motion to reopen with the immigration courts.  *See Andriasian*, 180 F.3d at 1041 (due process

3   requires notifying noncitizens of right to apply for asylum and withholding to the country where

4   they will be removed).

5         Fourth, DHS must provide the noncitizen with adequate time to prepare and file a motion

6   to reopen in order to challenge DHS's country designation and/or apply for asylum, withholding,

7   and relief under the CAT.  *See Mathews*, 424 U.S. at 333 (due process requires opportunity to be

8   heard at meaningful time and in meaningful manner).  The Government appears to have no

9   objection to this requirement given that ICE stayed petitioner's removal to give him time to file a

10  motion to reopen.

11        These requirements add important procedural safeguards that appropriately balance the

12  noncitizen's private interests affected by removal to a country designated outside of removal

13  proceedings and the government's interest in lawfully removing noncitizens who are subject to

14  final orders of removal.  *See Eldridge*, 424 U.S. at 334-35 (to determine requirements of due

15  process, courts consider (1) the private interest affected, (2) the government's interest, and (3) the

16  value added by alternative procedural safeguards to what has already been provided in the

17  particular situation before the court).

18        Petitioner argues that DHS should bear the burden of moving to reopen because DHS is

19  the party that wishes to disturb the finality of the IJ's decision, citing 8 C.F.R. § 1003.23(b)(3).[4]

20  _____

[4] The regulation states:

21

22       Motion to reopen.  A motion to reopen proceedings shall state the new facts that will be proven at a
         hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary
         material.  Any motion to reopen for the purpose of acting on an application for relief must be
         accompanied by the appropriate application for relief and all supporting documents.  A motion to

23       reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be
         offered is material and was not available and could not have been discovered or presented at the

1    The Court does not read § 1003.23(b)(3) as including such a requirement.  As the Government

2    asserts, there is no authority placing this burden on DHS.  *Cf. Zabadi v. Holder*, 407 Fed. Appx.

3    219, 222 (9th Cir. 2011) (unpublished) (where petitioner presented unripe claim that the

4    government could "whisk" him away in the night to a country not designated by an IJ without an

5    opportunity to challenge the country designation, court suggested that if the claim ripened, the

6    *petitioner* could seek appropriate legal remedies).  Petitioner also contends that requiring him to

7    move to reopen would effectively result in him waiving his legal arguments that the designation

8    of Somalia is improper.  Petitioner, however, fails to point to any instance in which this has

9    occurred.  The Court is not persuaded that DHS should bear the burden of moving to reopen.

10   E.    <u>Whether DHS complied with due process in petitioner's case</u>

11          In this case, DHS failed to comply with most of the procedures announced above.  First,

12   DHS did not provide petitioner with written notice that Somalia was being designated outside of

13   removal proceedings.  Although Officer Alvarez informed petitioner that he was going to apply

14   for a travel document to Somalia, this is insufficient notice, particularly where petitioner declined

15   to assist in procuring a travel document and Officer Alvarez did not inform him that a travel

16   document application was submitted or that a travel document was procured.  Second, there is no

17

18         former hearing.  A motion to reopen for the purpose of providing the [noncitizen] an opportunity to
           apply for any form of discretionary relief will not be granted if it appears that the [noncitizen's]
19         right to apply for such relief was fully explained to him or her by the Immigration Judge and an
           opportunity to apply therefore was afforded at the hearing, unless the relief is sought on the basis of
20         circumstances that have arisen subsequent to the hearing.  Pursuant to section 240A(d)(1) of the
           Act, a motion to reopen proceedings for consideration or further consideration of an application for
           relief under section 240A(a) (cancellation of removal for certain permanent residents) or 240A(b)
21         (cancellation of removal and adjustment of status for certain nonpermanent residents) may be
           granted only if the [noncitizen] demonstrates that he or she was statutorily eligible for such relief
22         prior to the service of a notice to appear, or prior to the commission of an offense referred to in
           section 212(a)(2) of the Act that renders the [noncitizen] inadmissible or removable under sections
23         237(a)(2) of the Act or (a)(4), whichever is earliest.  The Immigration Judge has discretion to deny
           a motion to reopen even if the moving party has established a prima facie case for relief.

     8 C.F.R. § 1003.23(b)(3).

     REPORT AND RECOMMENDATION - 17

1   evidence in the record that Officer Alvarez expressly asked petitioner if he feared persecution or

2   harm upon removal to Somalia, and the parties dispute whether petitioner stated such a fear *sua*

3   *sponte*.   Third, assuming petitioner did inform Officer Alvarez that he feared persecution in

4   Somalia, Officer Alvarez did not inform petitioner of his rights or provide him an opportunity to

5   seek relief.  ICE did not cancel its removal plans until petitioner's attorney became involved.  To

6   its credit, ICE gave petitioner several months to file a motion to reopen, and petitioner declined to

7   do so out of concern over waiving his rights.  Now that the Court has clarified that petitioner must

8   move to reopen, ICE must give him additional time to pursue such relief.

9         Petitioner contends, however, that DHS is barred from designating Somalia as his country

10   of citizenship or nationality because it is bound by its judicial admission in the NTA that he is a

11   native and citizen of Kenya.  He also argues that DHS is barred by res judicata from designating

12   Somalia now, when his connection to Somalia was clear in the record during his removal

13   proceedings.  Petitioner further maintains that DHS should be estopped from removing him to

14   Somalia because ICE attempted to remove him after he expressed a fear of harm in Somalia and

15   because of Officer Alvarez's errors in his travel document application.

16         The Court believes these questions should be addressed by the immigration courts in the

17   first instance.   In the immigration habeas context, exhaustion is prudential rather than

18   jurisdictional, and therefore it may be waived.  *See V. Singh*, 638 F.3d at 1203 n.3; *Puga v. Chertoff*,

19   488 F.3d 812, 815 (9th Cir. 2007).  When deciding whether to require prudential exhaustion, courts

20   consider whether "(1) agency expertise makes agency consideration necessary to generate a proper

21   record and reach a proper decision; (2) relaxation of the requirement would encourage the

22   deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the

23   agency to correct its own mistakes and to preclude the need for judicial review." *Puga*, 488 F.3d

REPORT AND RECOMMENDATION - 18

at 815 (quoting *Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 881 (9th Cir. 2003)).  Even if these factors weigh in favor of prudential exhaustion, waiver of exhaustion may be appropriate "where administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004) (quoting *S.E.C. v. G.C. George Sec., Inc.*, 637 F.2d 685, 688 (9th Cir. 1981)).

All of these factors favor requiring prudential exhaustion of this issue.  Whether a country is appropriately designated under § 1231(b)(2) is a question IJs regularly address and an IJ should be the first to consider petitioner's arguments on this issue.  If the Court were to consider petitioner's claims here, it would encourage others to challenge DHS's post-removal-order country designation in federal rather than immigration court.  Administrative review is likely to correct any mistakes.  In addition, there is no evidence that administrative remedies will be inadequate, futile, or void, or that petitioner will suffer irreparable harm absent immediate intervention by this Court.  For these reasons, petitioner should be required to exhaust his claim that DHS is barred from designating Somalia.[5]

F.    Whether petitioner is entitled to immediate release

Petitioner is currently detained under 8 U.S.C. § 1231(a)(6), which grants DHS the discretionary authority to detain certain noncitizens who have been ordered removed or to release them on supervision.  Although § 1231(a)(6) authorizes ICE to detain petitioner, it cannot do so indefinitely.  In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court held that § 1231(a)(6) implicitly limits a noncitizen's detention to a period reasonably necessary to bring about that individual's removal from the United States, and does not permit "indefinite" detention.  *Id.* at

---

[5] The Government argues that the Court should require prudential exhaustion of all of petitioner's claims. The remaining issues raised in this action, however, are appropriate for resolution at this time.

701.  The Supreme Court determined that it is "presumptively reasonable" for ICE to detain a noncitizen for six months following entry of a final removal order while it works to remove the individual from the United States.  *Id.*  "After this 6-month period, once the [noncitizen] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.*  If the Government fails to rebut the noncitizen's showing, the noncitizen is entitled to habeas relief.  *Id.*

In this case, ICE released petitioner on an order of supervision after Kenya declined to issue a travel document, finding that his removal was not likely in the reasonably foreseeable future.  Dkt. 7 at ¶ 18.  On June 18, 2018, ICE revoked his release because it had obtained a travel document from the Somali government and therefore believed his removal was likely to occur in the reasonably foreseeable future.  *Id.* at ¶ 23.  The travel document expired on November 18, 2018.  The Government asserts that there is no indication that the Somali government will not issue another travel document for petitioner.  *See* Dkt. 7 at ¶ 37.

Petitioner argues that he is entitled to immediate release because Kenya has refused to accept him and Somalia is not an appropriately designated country of removal.  As discussed above, DHS acted within its authority to designate Somalia.  The next step is for petitioner to challenge that designation in the immigration courts and, if he is unsuccessful, seek asylum, withholding, or relief under the CAT.  Although this process will take time, the fact that there is no clear end date does not mean that there is no significant likelihood of removal in the reasonably foreseeable future.  *See Diouf v. Mukasey* ("*Diouf I*"), 542 F.3d 1222, 1233 (9th Cir. 2008).  The relevant question is whether petitioner will still be removeable if the government prevails in the immigration courts.  *Id.*  The record suggests the answer is no; if DHS prevails, it will be able to

remove petitioner to Somalia.  Accordingly, the Court concludes that petitioner's detention is not indefinite within the meaning of *Zadvydas* and that he is not entitled to immediate release.

However, because petitioner has been detained for more than six months, he is entitled to a bond hearing under *Diouf v. Napolitano* ("*Diouf II*"), 634 F.3d 1081, 1082 (9th Cir. 2011) (holding that a noncitizen detained under § 1231(a)(6) for more than six months is entitled to release on bond unless the government establishes by clear and convincing evidence that he is a flight risk or a danger to the community).  Thus, the Government should be ordered to provide petitioner with such a hearing if he has not already received one.

G.    Temporary stay of removal

Neither party's briefing addresses the temporary stay of removal entered in this case. Nevertheless, it appears that the temporary stay of removal may be vacated given the Court's determination that due process requires the Government to afford petitioner sufficient time to file a motion to reopen to challenge removal to Somalia, as well as the Government's willingness to stay petitioner's removal for this purpose.

IV.    <u>CONCLUSION</u>

The Court recommends that both petitioner's habeas petition, Dkt. 1, and the Government's motion to dismiss, Dkt. 5, be GRANTED in part and DENIED in part.  Specifically, petitioner is entitled to an opportunity to file a motion to reopen with the immigration court and a bond hearing. In addition, the temporary stay of removal, Dkt. 3, should be VACATED.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your

right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on <u>**February 8, 2019**</u>.

Dated this <u>23rd</u> day of January, 2019.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION - 22